IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ANDREW E. ERICSON,                    )            8:11CV432
                                      )
              Plaintiff,              )
     v.                               )          MEMORANDUM
                                      )          AND ORDER
MICHAEL J. ASTRUE,                    )
Commissioner of the Social Security   )
Administration,                       )
                                      )
              Defendant.              )


        Plaintiff, Andrew E. Ericson, brings this suit to challenge the Social Security
Commissioner's final administrative decision denying his applications for disability
insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II
and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.[1]  Plaintiff
contends the administrative law judge (ALJ) did not give sufficient weight to the
opinion of his treating psychiatrist, James O'Sullivan, M.D., and, although supposedly
giving greater weight to the opinion of a consultative psychologist, Jennifer Grubler,
Ph.D., the ALJ also failed to accept one of her findings when assessing Plaintiff's
residual functional capacity.  In addition, Plaintiff contends the Appeals Council of
the Social Security Administration erred by failing to review new evidence presented
in connection with a subsequent SSI application that received approval before the
issuance of the final decision in this case.


        For the reasons discussed below, the Commissioner's decision will be reversed
and the case will be remanded for further proceedings.

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3),
provide for judicial review of the Commissioner's final administrative decisions under
Titles II and XVI.

## *I. Background*

Plaintiff, a 58-year-old college graduate who worked 15 years as a computer analyst, claims he has been disabled since December 31, 2003, because of certain physical and mental limitations.  His applications for DIB and SSI were denied initially on March 21, 2007,[2] with the Commissioner explaining:

> You stated that you have been unable to work due to a right foot amputation, diabetes, hypertension, neuropathy, anxiety and depression. The medical evidence does show that you did have an infection of the right leg which resulted in an amputation below the knee. You are able to use an artificial limb successfully. A recent examination showed that you do have some loss of sensation of the left leg. You are taking medication for a mental condition which does appear to be helping. The evidence does not sow [*sic*] that your mental condition further limits you. We do agree that you are not able to do jobs that require heavy physical labor. However, you can still do your past work as a computer analyst as you have described this job.

(Tr. 114)[3]  The applications were also denied on reconsideration, on June 19, 2007, with this further explanation:

> You said that you were unable to work due to diabetes, the amputation of your right foot, high blood pressure, neuropathy, anxiety, and depression. Medical records show you have a history of these conditions. Records did not establish that your mental conditions severely limit your work abilities at this time. However, they did show that your physical conditions will limit you to less strenuous types of work with limited lifting and bending. Your past job as a computer analyst would fall within these restrictions based on the job demands that you described. Therefore, it has been concluded that you maintain the ability to do a job

---

[2] Plaintiff's applications were filed on January 25, 2007.

[3] The administrative record, or transcript ("Tr."), was filed electronically and appears on the court's docket sheet as filings 9 and 10.

that you have performed in the past and cannot be found eligible for benefits at this time.

(Tr. 121) Following these denials, on July 17, 2007, Plaintiff filed a request for an administrative hearing. (Tr. 126)

Ronald D. Lahners, an administrative law judge, conducted a series of hearings in Omaha, Nebraska, on June 4, 2009 (Tr. 100-107), June 10, 2009 (Tr. 63-99), December 3, 2009 (Tr. 51-62), and February 4, 2010 (Tr. 34-50).[4] Plaintiff, who was represented by counsel, appeared at each of these hearings and provided testimony during the second and final hearings.  A vocational expert also testified at these hearings.

The ALJ issued an unfavorable decision on February 17, 2010, finding, among other things, that Plaintiff does not have a severe mental impairment.  The ALJ concluded that Plaintiff is not disabled because he is capable of performing his past relevant work. Evaluating Plaintiff's claim using the 5-step sequential analysis

---

[4] The hearing was rescheduled from June 4 to June 10, 2009, because the record did not contain a report letter from Dr. O'Sullivan (Exhibit 15F).  Although the matter was taken under submission at the conclusion of the June 10th hearing, the ALJ subsequently ordered a psychological examination of Plaintiff by Jennifer Grubler, Ph.D., and then scheduled another hearing for December 23, 2009. That supplemental hearing was  continued to February 4, 2010, after Plaintiff's attorney objected that he had not received a copy of the consultative psychologist's report (Exhibit 22F).

prescribed by Social Security regulations,[5] Judge Lahners made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

> 2. The claimant has not engaged in substantial gainful activity since December 31, 2003, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3. The claimant has the following severe impairments: Osteomyelitis of the right leg, status post below-the-knee amputation on January 14, 2004 (Exhibit 1F/137), related to diabetes, with prosthesis in place; diabetes mellitus; and peripheral neuropathy (20 CFR 404.1520(c) and 416.920(c)).[6]

---

[5] "At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

[6] The ALJ made a specific finding that "[t]he claimant's mental impairment does not impose significant functional limitations and is not a severe impairment." (Tr. 22)  In support of this finding, the ALJ stated:

> In activities of daily living, the claimant has no restriction. The claimant testified that he can walk one mile and does so two or three times per week and that, weather permitting, he can ride his bike two to three miles, which he said takes him a couple of hours.

. . .

4. The claimant does not have an impairment or combination of
impairments that meets or medically equals one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5. After careful consideration of the entire record, the undersigned
finds that the claimant has the residual functional capacity to perform
sedentary work as deemed in 20 CFR 404.1567(a) and 416.967(a),
except he is unable to do major pushing with his right leg. He stated that
he could use his right leg to ride a bicycle. He is limited to occasional
bending, stooping, and kneeling. Squatting and crawling would be more
difficult for him. He must avoid exposure to concentrated cold, heat, and
fumes. He has no problem understanding and following even detailed
instructions, and he has no difficulty understanding and carrying out
complex instructions. He can make judgments on decisions. He can
interact with the public, co-workers, and supervisors.[7]

---

The claimant has adequate social functioning, as noted by A. James Fix,
Ph.D., who completed a consultative psychological evaluation of the
claimant. (Exhibits 9F/6, 7F/13)

With regard to concentration, persistence or pace, the claimant has mild
difficulties. Dr. Fix opined that the claimant was able to sustain
concentration and attention. (Exhibit 7F/13)  The claimant has had no
episodes of decompensation of extended duration.

(Tr. 22)

[7] The RFC assessment does not include the ALJ's finding at step 2 that Plaintiff
has "mild difficulties" in maintaining concentration, persistence, and pace (Tr. 22).
In this regard, the ALJ stated:

The claimant repeatedly reported fatigue, but there appears to have been
no testing to indicate that he could not work. . . . The most recent

-5-

. . .

6. The claimant is capable of performing past relevant work as a computer analyst. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

. . .

7. The claimant has not been under a disability, as deemed in the Social Security Act, from December 31, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 21-26)

---

available psychological evidence indicates that the claimant's mental impairments are mild and non-severe and were unlikely to produce the level of fatigue alleged by the claimant.

Records prepared for the Department of General Assistance state that the claimant cannot work (Exhibit l8F), but on September 14, 2009, Jennifer Grubler, Ph.D., completed a consultative psychological evaluation of the claimant and reported that he reported fatigue but worked at an average pace during the assessment. She said that his ability to interact with supervisors, coworkers, and the public was not affected by his impairment. Similarly, she opined that his ability to understand, remember, and carry out instructions was not affected by the impairment. She said that the claimant's current performance on the WAIS-IV showed above-average intelligence. Her diagnoses included adjustment disorder with anxiety and depressed mood, and personality disorder, and she rated his Global Assessment of Functioning at 55 out of a possible 100, indicating moderate symptoms or moderately limited functioning. (Exhibit 22F)

(Tr. 24)

On March 1, 2010, Plaintiff requested review of the ALJ's decision by the Appeals Council.  (Tr. 13) However, on July 1, 2011, Plaintiff's attorney wrote the Appeals Council and requested that the case be remanded because Plaintiff "filed a subsequent application and was approved on his Title XVI benefits." (Tr. 9)  Enclosed with this correspondence was a copy of an earlier letter, dated December 15, 2010, in which Plaintiff's attorney had made the same request.  (Tr. 11)

On October 24, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  The Appeals Council advised Plaintiff that it "considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning June 1, 2010, based on the application(s) you filed on June 14, 2010; however, the Appeals Council found that this information does not warrant a change in the Administrative Law Judge's decision."  (Tr. 2)  Upon denial of the request for review,[8] the ALJ's decision became the final decision of the Commissioner.  *See Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Plaintiff filed this action on December 16, 2011, alleging that "[t]he ALJ improperly substituted his opinion for the opinion of the treating source[,]" that "[t]he ALJ's decision is not supported by substantial medical evidence[,]" that "[t]he ALJ improperly rejected the Plaintiff's subjective allegations[,]" and that "[t]he ALJ posed a hypothetical question to the vocational expert that does not adequately describe Mr. Ericson's limitations."  (Filing 1, ¶¶ 21-24)

---

[8] The Appeals Council's decision to deny Plaintiff's request is not subject to judicial review. The court's role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including any new evidence submitted after the determination was made that the Appeals Council considered. *See Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).

## II. Discussion

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995).

### A. Dr. O'Sullivan's Opinion

Plaintiff first complains that the ALJ failed to recognize that James O'Sullivan, M.D., qualifies as a "treating source," a category which includes "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902. While the ALJ's decision is indefinite on this point, the Commissioner does not dispute that Dr. O'Sullivan is, in fact, a "treating source." The Commissioner contends, however, that Dr. O'Sullivan's opinion was correctly evaluated by the ALJ.

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). Otherwise, the weight given to a medical opinion[9] depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996). A decision which is not fully favorable "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

The decision in this case contains a very brief explanation which indicates that the ALJ discounted Dr. O'Sullivan's opinion because it was conclusory and was not based on an extensive treatment history. The ALJ stated:

> In finding the claimant not disabled, the undersigned has given more weight to the opinion of Dr. Grubler than to that of James O'Sullivan, M.D., who followed the claimant at the Douglas County Community Mental Health Center, and who opined in April 2009 essentially that the claimant was disabled from competitive employment. (Exhibit l5F) Dr. O'Sullivan stated that he had followed the claimant's

---

[9] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) .

care for over one year (Exhibit l5E/2), but medical records from Douglas
County CMHC show very few entries by Dr. O'Sullivan until 2009.
(Exhibits 17F, 14F, 24F, 23F, 21F)

(Tr. 25) This explanation is inadequate for a number of reasons.

First, Dr. Grubler is a consultative psychologist who examined Plaintiff just
once, in September 2009, and did not review any treatment records before giving an
opinion that Plaintiff's only limitation in working ability was a self-reported lack of
motivation. (Tr. 951-961). By contrast, Dr. O'Sullivan, a board certified psychiatrist,
saw Plaintiff at least six times between August 2007 and March 2009 while Plaintiff
was being treated for major depression at the Douglas County Community Mental
Health Center, and he reviewed Plaintiff's medical records before giving an opinion
in April 2009 that Plaintiff is moderately to severely limited in his ability to perform
most work-related functions (Tr. 866-868). The fact that the Mental Health Center
records contain "very few entries by Dr. O'Sullivan until 2009" is not a good reason
for giving more weight to Dr. Grubler's opinion.[10]

---

[10] The Commissioner argues that "Dr. O'Sullivan's opinion was more akin to
a consultative opinion than a true treating opinion" because he "did not see Plaintiff
very often before January 2009" and "appears to have developed his assessment based
on a review of the record, and a clinical interview undertaken for purposes of the
assessment" (filing 19 at 21). Even assuming that Dr. O'Sullivan's opinion should be
discounted for these reasons, *see, e.g., Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir.
2010) (ALJ justified in giving little weight to opinion of treating physician who saw
claimant only four times and prepared statement at request of claimant's attorney
rather than in course of treatment), it does not follow that his opinion is entitled to less
weight than the opinion of a psychologist who conducted a one-time consultative
examination and reviewed no treatment records.

-10-

Second, Dr. O'Sullivan did not simply opine that Plaintiff is disabled.[11] Instead, he completed a medical source statement (Tr. 870-871) using a form similar to one used by Dr. Grubler (Tr. 960-961) and also dictated a narrative report to explain the conclusions reached.  Dr. O'Sullivan's narrative report reads:

> . . . I confirm that on this date [April 13, 2009] I did go through [Mr. Ericson's] Primary Health Care files and observed the various physical difficulties that he has had and in terms of the requirements of the Social Security Administration I note that in terms of his depressive problems that there is a particular problem with variable appetite disturbance with a change in weight-complicated by his diabetes, a sleep disturbance, a massive problem with decreased energy and problems in having the energy to do anything, ideas of guilt and worthlessness, difficulty with his concentration, focusing and thinking, that he has in the past experienced ideas of self harm and notes a profound loss in his enthusiasm and ability to take pleasure out of any real activities.

> I did question him with respect to any possible episode of manic or hypomanic syndrome and he does not appear to have had this, though certainly before the unfortunate amputation of his right leg below the knee, it would appear as though his energy was far superior to what it is now. I noted that because of his problems, he has a marked restriction of the activities of daily living, has problems and marked difficulties in maintaining social functioning and his day to day existence is characterized by marked difficulties maintaining concentration, persistent pace, energy, enthusiasm and that this has now been going on for a long period of time. His history is well documented in our records here, they are clearly of over 2 years' duration and certainly on the base [sic] of what I see would go back to the time of his amputation. His depressive problems would be superimposed upon a chronic underlying

---

[11] Whether Plaintiff is disabled is an issue reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183 (Soc. Sec. Admin. July 2, 1996); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

dysphoric syndrome that would have been fed by childhood experiences of a traumatic nature. He certainly has a residual disease process, his adjustment now is such that I see no possibility of any further employment capability, and advise that to attempt such activity would be deleterious to his already fragile and disabled mental condition. I confirm that I have treated him now for a period of over one year, I note that he sees me for appointments and that he is diligent in his attendance. His diagnosis continues to be that of Major Depressive Disorder, Recurrent, Severe. Axis III diagnoses are diabetes mellitus with significant arteriosclerotic and microvascular disease affecting both lower limbs, both hands an [*sic*] also the cerebral microvasculature. Certainly his ability to operate and function is very severely impaired and I believe that the diabetes has played a significant part in this by its interference with his cerebral circulation.

In terms of his depressive syndrome I note anhedonia and loss of interest in almost all activities, psychomotor retardation, markedly decreased energy, ideas of self blame, guilt and worthlessness, problems with his concentration and thinking that would compound those produced by the diabetes, having past ideas of suicide, he does not admit to hallucinations to me. He is rather fatalistic and expecting that things will not work out well for him, certainly he has a reality basis for this. I would see him as significantly impaired in terms of his activities of daily living, one can see a deterioration in his grooming, while he maintains his personally hygiene. He would use much of his energy in trying to just maintain a very minimal level of functioning in his living situation. Anything beyond this would tend to overwhelm is available resources. He has a defect in planning daily activities and in particular in initiating and participating in activities independent of supervision and direction. He of course is not only short of energy but also short of money.

In terms of his social functioning I note in particular problems with his ability to initiate social contact, I cannot comment on his ability to cooperate with others as he spends so much time on his own. He does have difficulty in responding to certain individuals in authority, in particular if there is an aspect of overbearing or bullying. He has always had a problem in responding without fear to strangers. His illness has resulted in major difficulties in him not only holding but even having the ability to attract any employment opportunities. There is a history of

-12-

problems with evictions in the past. In terms of problems in maintaining concentration, persistence and pace there are problems with concentration, persistence in tasks that he tends to exhaust easily, he would have a problem in completing tasks in a timely manner and these would be marked to extreme. He would find it impossible to assume increased mental demands associated with competitive work. In terms of his ability to sustain tasks without an unreasonable number of breaks or rest periods that would also be impossible as would his ability to sustain tasks without undue interruptions or distractions.

I note on questioning him that in stressful circumstances he has in the past displayed problems with inability to appropriately accept supervision. He has withdrawn from stressful situations; it is led to an exacerbation in tenus of signs of his illness and also its symptoms. His level of functioning has deteriorated markedly to an extent that he did not recognize initially because of the combination of the depression and his disturbed cerebral vascular tree. I would see him as having an inability to cope with schedules, poor decision making and certainly would have a profound inability to adopt to changing demands.

As I have noted his difficulties have gone on at least 2 years and he does have a residual disease process, with of course the gradual worsening of his cognitive functioning arising from the coexistent diabetic illness and the injuries that it is causing him. He does have a walker at home but otherwise no assistance. He has had his right lower limb amputated [below] the knee for Diabetic Arteriosclerotic Arterial Insufficiency. The function of the medications that I provide him with are to attempt to enhance his function and I have been unable to enhance it to a degree that would enable him to in any way manage or support himself.

Certainly from my discussions and examination of him, I note that he finds that he has really never been the same and has been disabled from 2004 following his amputation surgery and I see no reason not to agree with this opinion. There has been no major change in his condition since I have seen him other than I would see him as having ongoing problems related to a chronic deterioration due to his diabetes, and also the effects and demoralizing elements of his illness, impecuniousness

and chronic persisting pain and physical problems. I do not see any significant improvement in his status before he passes on.

(Tr. 866-868)

Third, and most importantly, the ALJ made no finding that Dr. O'Sullivan's diagnosis or his assessment of the severity of Plaintiff's mental condition were unsupported by medically acceptable diagnostic techniques, nor did he identify or attempt to resolve any inconsistencies between Dr. O'Sullivan's opinion and the opinions of other medical sources. The ALJ merely indicated that more weight was given to Dr. Grubler's opinion.  A review of the record does not establish that the ALJ's failure to explain this result constitutes harmless error.[12] "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (internal marks and citations omitted).

In November 2006, Eugene Oliveto, M.D., a psychiatrist at Lutheran Family Services, diagnosed Plaintiff with "Anxiety Disorder NOS, maybe associated with alcohol," "R/O Dysthymic Disorder," "Major Depressive Disorder," "Posttraumatic Stress Disorder," and "Alcoholism, life-long" (Tr. 681-682).  He assigned Plaintiff a Global Assessment of Functioning (GAF) score of 50-55, indicating moderate to

---

[12] An ALJ's error is harmless if the court can determine from the record that "the ALJ would inevitably have reached the same result" had the proper procedure been followed.  *Dewey v. Astrue*, 509 F.3d 447, 449-50 (8th Cir. 2007).  *See also Moran v. Astrue*, No. 4:07-CV-073, 2008 WL 2705091, *18-19 (D.N.D. July 8, 2008) (collecting cases discussing harmless-error analysis with reference to mandatory-discussion requirement for treating sources).

-14-

serious symptoms or functional difficulties[13] (Tr. 685). Dr. Oliveto prescribed Klonopin (Clonazepam) for treatment of Plaintiff's anxiety (Tr. 685) and in December 2006 added Lexapro (Escitalopram) for treatment of Plaintiff's depression (Tr. 677). In February and July 2007, Dr. Oliveto advised the Douglas County Department of General Assistance that Plaintiff's mental condition prevented him from working (Tr. 937-938).

A. James Fix, Ph.D., completed a consultative psychological examination in March 2007 (Tr. 783-788). He diagnosed dysthymic disorder under reasonable medical control and opined that Plaintiff was not restricted in terms of activities of daily living, social functioning, or attention or concentration (Tr. 788). He also felt that Plaintiff could understand instructions, work under ordinary supervision, relate appropriately to others, and adapt to changes in his environment (Tr. 788). He assessed a GAF score of 50, indicating serious symptoms or functional limitations (Tr. 788).

---

[13] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (*DSM-IV-TR*) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. A GAF score of 51 through 60 is characterized by moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See id.* A GAF score of 41 through 50 is characterized by serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See id.*

Although the GAF scale is not endorsed by the Social Security Administration because its scores do not have any direct correlation to the disability requirements and standards of the Act, *see* 65 Fed.Reg. 50746, 50764-65 (2000), as with any other clinical findings contained in narrative reports of medical sources, the ALJ should consider and weigh this evidence under the standards set forth in the regulations for evaluating medical opinions.

Linda Schmechel, Ph.D., a non-examining Disability Determination Services (DDS) psychologist, completed a psychiatric review technique (PRT) in March 2007 after reviewing Dr. Oliveto's and Dr. Fix's reports (Tr. 760-773).[14] She noted that Dr. Fix "did not document severe problems with attention/concentration," that while Plaintiff stated "he has had a lifelong problem with anxiety/depression, he has not had any treatment since the 1980's and his earnings record shows very substantial earnings through the year 2003," and that "LFS records indicate his reason for starting treatment there was due to a DWI" (Tr. 772). Dr. Schmechel believed that Plaintiff's mental impairments caused mild limitations in his activities of daily living, social functioning, and maintenance of concentration, persistence or pace (Tr. 770). This opinion was affirmed in June 2007 by a second non-examining DDS psychologist, Lee Branham, Ph.D. (Tr. 805).

When Dr. Grubler interviewed and tested Plaintiff in September 2009, she diagnosed an adjustment disorder with anxiety and depressed mood and also an alcohol disorder (Tr. 955). She assigned a GAF score of 55, indicating moderate symptoms or functional limitations (Tr. 956). Dr. Grubler concluded, however, that "Mr. Ericson's primary difficulty appears to be related to poor personality functioning associated with a passive and ineffectual approach to life" and commented that "he appears to have little true motivation for improving his situation" (Tr. 956). In a separate medical source statement, Dr. Grubler indicated Plaintiff has no limitations in his "ability to understand, remember, and carry out instructions" or "to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting" (Tr. 960-961). She also stated, however, that Plaintiff has limited "motivation to initiate tasks and persist with tasks" as a result of

---

[14] "Psychiatric review technique analysis is required to be conducted and documented at each level of the review process, including the ALJ level. The technique involves determination of whether there is a mental impairment followed by a rating of the degree of functional limitation resulting from the mental impairment." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007). *See* 20 C.F.R. §§ 404.1520a, 416.920a.

-16-

his mental impairment (Tr. 961).  Dr. Grubler noted this limitation was "only by self-report" and observed that Plaintiff "worked at average pace during assessment but complained of fatigue" (Tr. 961).  Dr. Grubler also stated in her narrative report that Plaintiff "complained of difficulty maintaining attention and concentration but demonstrated average to above average skill in these areas during the current evaluation" (Tr. 965).  Plaintiff further "reported that his daily activities are limited on a 'day to day' basis by his lack of energy" but "he has no difficulty with regard to social functioning" (Tr. 955).

In summary, two treating psychiatrists have diagnosed Plaintiff with major depressive disorder, while two consultative psychologists have concluded that he has a less severe impairment—either a dysthymic disorder (*i.e.*, chronic depression)[15] or an adjustment disorder (*i.e.,* situational depression).  Dr. O'Sullivan opined that because of his mental condition, Plaintiff is moderately to severely limited in activities of daily living, in social functioning, and in concentration, persistence, or pace, while the non-examining DDS psychologists were of the opinion that Plaintiff's functional limitations in these areas are mild. Dr. Grubler opined that Plaintiff has no problem with following instructions and making work-related decisions, or with interacting and responding appropriately in the workplace, but felt he lacks motivation.

Without a satisfactory explanation of the reasons why the ALJ refused to give controlling or great weight to the opinion of Plaintiff's treating psychiatrist, or why he gave less weight to that opinion than to the opinion of a consultative psychologist, there is no basis for meaningful judicial review of the ALJ's decision.  The case therefore will be remanded for a reassessment of Dr. O'Sullivan's opinion.

---

[15] As noted above, however, Dr. Fix assigned Plaintiff a GAF score of 50, which indicates Plaintiff exhibited serious symptoms or functional limitations.

### B.  Dr. Grubler's Opinion

Plaintiff also complains that the ALJ, in making a residual functional capacity assessment, "failed to incorporate all of Plaintiff's limitations, particularly Dr. Grubler's opinion that Plaintiff's impairment affected his motivation to initiate tasks and persist with tasks. (*Cf.* Tr. 23, 961)" (filing 13 at 23).  The Commissioner accuses Plaintiff of "putting words in Dr. Grubler's mouth" and contends the psychologist "was referring to Plaintiff's ability to initiate 'internal changes,' not his ability to complete work-related tasks (Tr. 956)" (filing 19 at 23).  Dr. Grubler actually made both statements.

In any event, the ALJ found as part of the psychiatric review technique at the second step of the 5-step evaluation process that Plaintiff has "mild difficulties" with regard to concentration, persistence or pace (Tr. 22).  This finding is consistent with Dr. Grubler's assessment that Plaintiff lacks motivation to initiate and persist with tasks.  Dr. Grubler's diagnosis of an adjustment disorder also generally supports the ALJ's determination that Plaintiff does not have a severe mental impairment.

Plaintiff argues it was reversible error for the ALJ to fail to include any mental limitation in the hypothetical question that was posed to the vocational expert, but the Eighth Circuit has held on at least one occasion that an ALJ "did not err by excluding the claimant's mental limitations from the hypothetical questions to the VE, when substantial evidence supported the ALJ's determination that the claimant's mental limitations were 'nonsevere.'" *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) (citing *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir.1998)).

### C.  New Evidence

Finally, Plaintiff argues that the Social Security Administration's *Hearings, Appeals, and Litigation Law Manual* (HALLEX) requires that the case be remanded because although "[t]he Appeals Council considered the 'fact' that Plaintiff had been

-18-

found disabled on a subsequent application, [it] apparently did not consider the contents of the subsequent claim file." (Filing 13 at 23) The manual's "instructions for processing subsequent disability claims while a prior claim is pending review at the Appeals Council" state that "[i]f the initial (or reconsidered) determination in the subsequent claim is favorable, the [Appeals Council (AC)] will consider the evidence in the subsequent claim to determine whether there is new and material evidence relating to the prior claim." HALLEX I-5-3-17(I)(B), 2001 WL 34096370 (S.S.A. April 30, 2001). The Commissioner denies there was a violation of this policy.

As further stated in the manual, "[t]he fact that a subsequent application for disability benefits is allowed while a request for review (RR) of a prior denial is pending before the AC may or may not affect the AC's action on the appeal.  Each case requires consideration of the individual facts presented." HALLEX I-5-3-17 (III)(B)(2), 2001 WL 34096370 (S.S.A. April 30, 2001). One example involves the fact situation presented in this case (*i.e.*, "Claim filed under title II and denied through ALJ decision. RR is before the AC when a subsequent title XVI only claim is allowed with an onset date after the date of the ALJ decision." ), which can be resolved by the Appeals Council in one of three basic ways:

> The periods at issue are not the same; however, the subsequent allowance still raises a possibility that SSA has in its possession new and material evidence that relates to the period on or before the date of the ALJ's decision. If the analyst does not already have the subsequent claim file, [the Office of Appellate Operations (OAO)] will obtain it and the analyst will make a recommendation based on the record before the ALJ and all the additional material.
>
> > a. If there is new and material evidence that relates to the period on or before the date of the ALJ decision and the AC agrees with the subsequent allowance, the AC will grant review and, depending on the evidence, either issue a fully favorable decision, propose a partially favorable decision, or remand. . . .
> >
> > b. If there is not new and material evidence that relates to the period on or before the date of the ALJ decision, the AC agrees with the subsequent allowance and no other basis for

-19-

> granting review is present, the AC will deny the RR (see footnote 3 for language) and not disturb the subsequent allowance. . . .
>> c. If there is not new and material evidence that relates to the period on or before the date of the ALJ decision and the AC does not agree with the subsequent allowance, the AC will determine whether it can be reopened (see footnotes 4 and 5). . . .

*Id.*, Example 3.  The footnote referenced in paragraph b above states:

> The AC would add language to the denial notice as follows:
>> The AC considered the fact that since the date of the ALJ's decision, you were found to be under a disability beginning (date), based on the application you filed on (date); however, the Council found that this information does not warrant a change in the ALJ's decision.

HALLEX I-5-3-17 n. 3, 2001 WL 34096370 (S.S.A. Apr. 30, 2001).

This is the exact language that was used by the Appeals Council in denying Plaintiff's request for review in this case, which indicates that the claim file for his subsequent SSI application was in fact reviewed and was determined not to contain any new and material evidence relating to the applicable claim period.[16]  *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of

---

[16] "The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision." 20 CFR § 404.976(b)(1); *see also* 20 C.F.R. § 416.1476(b)(1).  "When the 'closed record' provisions apply, the Appeals Council will consider only the period through the date of the ALJ hearing decision and will not consider (based on the pending application) possible entitlement after that date. New evidence pertaining to the period after the ALJ hearing decision is 'material' to the decision on the application before the Appeals Council if it can reasonably be related to the period on or before the date of the ALJ hearing decision. The Appeals Council only evaluates evidence that is not new and material to the period through the date of the ALJ hearing decision to the extent necessary to determine that it is not new and material." HALLEX I-3-5-20, 1993 WL 643143, *1 (S.S.A. Sep. 8, 2005).

regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Wilburn v. Astrue*, 626 F.3d 999, 1003 (8th Cir. 2010) (applying presumption of regularity in social security appeal to conclude that ALJ properly reviewed prior hearing testimony).  The record does not support Plaintiff's claim that "[t]he Appeals Council failed to to [*sic*] obtain [his] claim file from his subsequent application (including additional medical opinion evidence from non-examining state agency medical consultants who assessed his abilities)."  (Filing 13 at 24-25)

Even if it might be questioned whether the Appeals Council violated HALLEX I-5-3-17 by failing to review Plaintiff's subsequent claim file, "the current state of the law in the Eighth Circuit does not support a conclusion that the HALLEX provision requires remand pursuant to Sentence Four [of § 405(g)]."  *Garcia v. Astrue*, No. 3:09CV26, 2010 WL 3769473, *2 (D.N.D. Aug. 27, 2010) (rejecting claimant's assertion that remand was required where subsequent DIB application was approved and claimant was found to be disabled one day after issuance of ALJ's unfavorable decision on first claim for benefits), *report and recommendation adopted*, 2010 WL 3769462 (D.N.D. Sep 17, 2010); *Iverson v. Astrue*, No. 3:08CV128, 2010 WL 1233846, *2 (D.N.D. Mar. 4, 2010) (Commissioner's refusal to follow HALLEX provision requiring Appeals Council to determine the effect, if any, of the allowance of a subsequent claim did not amount to substantive error requiring remand), *report and recommendation adopted*, 2010 WL 1233844 (D.N.D. Mar. 22, 2010).  *See also Lovett v. Astrue*, No. 4:11CV1271, 2012 WL 3064272, *10 (E.D.Mo. July 6, 2012) (concluding Eighth Circuit would hold that HALLEX does not have the force of law, citing *Ellis v. Astrue*, No. 4:07CV1031 AGF, 2008 WL 4449452, (E.D.Mo. Sep. 25, 2008)), *report and recommendation adopted*, 2012 WL 3062803 (July 17, 2012); *Weiland v. Astrue*, No. C11-0006, 2012 WL 195606, *13 (N.D.Ia., Jan. 23, 2012) (HALLEX does not have force of law, but provides guidance); *Heitz v. Astrue*, No. 09-CV-2019-LR, 2010 WL 1521306, *16 (N.D.Ia., Apr. 15, 2010) ("In the absence of a ruling from the Eighth Circuit Court of Appeals, coupled with the weight of

authority that HALLEX does not create judicially-enforceable rights, the court declines to find that an ALJ's failure to follow HALLEX is reversible error.").

Plaintiff contends that the claim file for his subsequent application should have been included in the administrative record for the present case, but this would have been contrary to the procedure outlined in HALLEX, which specifies that "[t]he file for the subsequent claim is *not* part of the administrative record of the ALJ decision; however, the subsequent file will be retained by OAO for review if a civil action is filed." HALLEX I-5-3-17(3)(B)(III)(3)(a), 2001 WL 34096370 (S.S.A. Apr. 30, 2001) (emphasis supplied). Plaintiff also requests that the Commissioner be ordered to produce the claim file so the court can determine for itself whether the file contains new and material evidence which relates to the period preceding the ALJ's decision. Because there is no showing that Plaintiff requested and was denied access to his subsequent claim file, this request will be denied.[17] Also, it is questionable whether the court has authority to review the subsequent claim file under 42 U.S.C. § 405(g), which merely provides that "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . .." *Cf. Hummer v. Heckler*, 736 F.2d 91, 93 (3d Cir. 1984) (limiting discovery under section 405(g) to

---

[17] "The [Privacy Act] states that, subject to certain exemptions, an individual may, ". . . gain access to his record or to any information pertaining to him which is contained in . . . [a system of records and] review the record and have a copy made of all or any portion thereof in a form comprehensible to him . . .." 5 U.S.C. 552a(d)(1). In accordance with this requirement, SSA generally provides . . . information which individuals request about themselves. 20 CFR 401.40[ ]. [SSA] also generally provide[s] such information to an individual's authorized representative. 20 CFR 404.1710 and 416.1510." Social Security Ruling (SSR) 92-1p, 1992 WL 425421, *2 -3 (Soc. Sec. Admin. March 6, 1992). *See also* 20 C.F.R. § 401.55(a) ("You have a right to access your medical records, including any psychological information that we maintain.").

situations "where information relating to a contention bearing on the fundamental fairness of the agency hearing is in the possession of the government").

### III. Conclusion

The ALJ committed reversible error by not providing sufficient reasons for discounting the opinion of Plaintiff's treating psychiatrist.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case is remanded to the Commissioner for further proceedings consistent with the foregoing opinion. Final judgment will be entered by separate document.

October 24, 2012.                              BY THE COURT:

                                              *Richard G. Kopf*
                                              Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.